George Washington, Sr. v. Commissioner. Lina Washington v. Commissioner. Louise Washington v. Commissioner.
Washington v. Commissioner
Docket Nos. 106900, 106901, and 106902.
United States Tax Court
1943 Tax Ct. Memo LEXIS 426; 1 T.C.M. (CCH) 682; T.C.M. (RIA) 43103; March 1, 1943
*426 Allen G. Gartner, Esq., 915 - 15th St., N. W., Washington, D.C., and Edward I. Sproull, C.P.A., 17 E. 42nd St., New York City, for the petitioners. Dean Kimball, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these consolidated proceedings petitioners challenge respondent's determination of 1932 gift tax deficiencies and delinquency penalties thereon. The taxes and penalties are as follows: Gift Tax
Penalty
George Washington, Sr
$50,405
$12,601.25
Lina Washington
30,875
7,718.75
Louise Washington
30,875
7,718.75
The primary question is whether the three petitioners as grantors of a trust created in 1932 made taxable gifts. Petitioners contend that a prior proceeding is res judicata as to the revocability of the trust. Findings of Fact Petitioners, George Washington, Sr., and Lina Washington, are husband and wife, and petitioner, Louise Washington, is their daughter. They are residents of Mendham, New Jersey, and in October, 1939, filed Federal gift tax returns for 1932 at the request of the internal revenue agent in charge at Newark, New Jersey. In 1932 George Washington, Sr., owned a large estate known as *427 Franklin Farms, sometimes herein referred to as the "Homestead Tract," located at Mendham, New Jersey, which he had previously acquired at a cost of $206,000. The estate was occupied by himself, his wife, and daughter Louise, and sometime prior to 1932 he desired to sell it in order to eliminate the heavy expense of its maintenance, and proposed that they move into a smaller house. His wife and daughter expressed their desire to continue living at the estate and to have it as a permanent home should they survive him. It was thereupon agreed that they would share the expense of the estate equally and during the first six months of 1932 the three petitioners each bore one-third of the expense of the estate. George Washington, Sr., Lina and Louise owned 4,123, 4,125, and 3,000 shares, respectively, of the stock of the G. Washington Coffee Refining Company from which they received dividends during the first six months of 1932. Clarence Mark was vice president of the company. His ability was highly regarded and the petitioners were desirous of retaining his services for the company and themselves. He held the minority interest in the company comprised of stock sold to him by the Washington *428 prior to 1932. It was agreed that a trust would be created in which he would be one of the trustees and the trust would hold the stock control of the company. In order to facilitate the handling of the expenses of Franklin Farms and to place the stock control of the company in a legal entity, and in order to assure that Lina and Louise might continue to live at Franklin Farms and to protect their interests in the event of the death of George Washington, Sr., the three petitioners created a trust on June 16, 1932. The instrument named petitioners as the settlors and George, Sr., Lina and Mark as the trustees. It recited that the Homestead Tract real property, subject to certain encumbrances, was being conveyed to the trustees by George, Sr., and Lina Washington, and the settlors were transferring all the goods, chattels, and personal property on the Homestead Tract to the trustees, and that each petitioner was transferring 3,000 shares of the coffee company stock. It was stated that such corpus was: * * * IN TRUST, nevertheless, for the lives of the said settlors and the last survivor of them, but in no event for less than fifteen years from the date of this agreement, for the uses *429 and purposes hereinafter set forth. The instrument provided in part as follows: FIRST: The trustees shall permit the settlors or any of them to use and occupy the Homestead Tract and the personal property located thereon as a home, rent free, without liability for waste and disposal of personal property, so long as they or any of them shall live or desire to do so, the cost and maintenance of said Homestead Tract to be paid by the trustees as long as the same is so used, as hereinafter provided. SECOND: The trustees shall hold, invest and reinvest the Personal Trust Estate and shall receive and collect the dividends, interest. income, issues, rents and profits arising therefrom and after deducting all lawful taxes, expenses and charges against the same (including proper counsel fees), during the continuation of the trust hereby created, shall apply the net income then remaining as follows: (A) IF THE GROSS INCOME RECEIVED FROM THE PERSONAL TRUST ESTATE SHALL NOT AMOUNT TO $200,000.00 PER ANNUM. (I) They shall pay all lawful taxes and assessments levied on the Homestead Tract. (II) They shall pay all interest due on all mortgages at any time existing on the Homestead Tract. *430 (III) They shall pay the principal of all sums due on said mortgages on said Homestead Tract or any installments thereon when the same shall become due and payable or may, with consent of the mortgagees, anticipate said mortgages or installments if in their judgment the anticipation of the same shall inure to the benefit of the Trust Estate. (IV) They shall keep the buildings on the Homestead Tract and the casualty, in such amount as they shall deem advisable, and pay the premiums thereon, and they shall pay any and all maintenance and upkeep charges of the Homestead Tract and such replacement and new construction or equipment or furnishing costs as may be requested by the settlors and/or which they may in their judgment deem desirable for the improvement of the Homestead Tract. (V) They shall pay such household and other bills of the settlors, or such of them as shall at any time be in occupation of the Homestead Tract, as shall be certified to said trustees by the settlor or settlors occupying said Homestead Tract. (VI) If after the death of the settlor George Washington. Sr. the settlors Lina Washington and Louise Washington shall elect to live apart, then during the lives of *431 said settlors Lina Washington and/or Louise Washington the annual payments to be made by the trustees for taxes, assessments, mortgage interest. insurance. maintenance, upkeep charges, replacement, new construction, equipment or furnishing costs of the Homestead Tract and household and other bills of such of said Lina Washington or Louise Washington as may be in occupation of the Homestead Tract as provided in items (I) (II) (IV) and (V) of this Article shall not exceed $70,000.00 per annum, and the balance of said income, subject to such payments as shall become due under item (III) of this Article, shall be distributed in accordance with item (VII) of this article. (VII) At the end of each calendar year, or as soon thereafter as it may be convenient, they shall distribute the net income then remaining to the settlors as long as they each shall live in equal parts. Upon the death of any settlor, said net income shall be paid to the survivor or survivors of said settlors in equal shares during their respective lives. (VIII) If during any calendar year the trustees shall have in their hands any income which, under the terms of this provision would be distributable to the settlors *432 at the end of said calendar year, said trustees may pay to the drawing accounts of said settlors, or any of them, such part thereof as said trustees may deem wise, and said payments when so made shall be charged against the distributive share of the settlor to whom such payment or payments are made. * * * * *
THIRD: In the event that the settlor Louise Washington shall survive the settlors George Washington, Sr. and Lina Washington. then. on the death of the survivor of said George Washington, Sr. and Lina Washington, said trustees shall convey, transfer and deliver the Homestead Tract, together with the contents thereof as the same may then exist, subject to mortgage encumbrances and special assessments as they may then exist, to the settlor Louise Washington, free of trust, for her own use, benefit and behoof forever, and shall continue to hold the Personal Trust Estate during the lifetime of said settlor Louise Washington, unless she shall die within fifteen years of the date of this agreement, in which event they shall hold the same for fifteen years from the date hereof, and shall distribute the net income therefrom arising as provided in article second hereof, except that *433 the trustees shall be relieved of making any payments for taxes, assessments, mortgage interest or mortgage principal, insurance, upkeep and household and personal expenses of the said Louise Washington with respect to the occupation of the Homestead Tract. * * * * *
NINETEENTH: This instrument may, during the lifetime of the settlor, George Washington, Sr., be revoked, altered or/and amended by the settlors on or after the first day of January in any year, but only upon condition and provided that the settlors shall in the preceding calendar year have notified in writing the trustees of their intention so to revoke, alter or amend this instrument. After the death of the said George Washington, Sr., the settlors hereby expressly declare that the trusts created hereunder shall be irrevocable, and they hereby waive any right which they may have or may hereafter receive by virtue of any statute or law to revoke the same or any part thereof. TWENTIETH: In the event that the settlors, or any of them, or their respective estates shall be called upon to pay any income, gift, estate or transfer inheritance taxes, levied or assessed against them or any of them or any of their several respective *434 estates, pursuant to any law now in effect or hereafter enacted or adopted, because of the creation, existence or termination of any of the trusts herein provided for, in addition to such tax as said settlor or settlors or his or her several respective estates shall be otherwise liable for, the same shall be refunded to the said settlor or settlors or his or her respective estates by the trustees hereunder and shall be deemed to be a proper charge against said trust estates. * * * * *
Article Second of the trust provided for payments of income to persons other than the settlors if the trust income exceeded $200,000 a year. Other parts of the instrument also provided for remainders over to other persons after the settlors' deaths. These contingent beneficiaries were for the most part relatives of the settlors. The gross income of the trust from its inception in 1932 never exceeded $200,000 per annum. There was no arguing or haggling between the three settlors in connection with the creation of the trust. They were on very good family terms with one another at the time. The provisions of remainders over to other persons after the death of the respective settlors was animated by *435 the same motives as would move one in making a will. The provision for distribution of income to others in case it exceeded $200,000 a year was animated by motives of generosity. At the time of the creation of the trust the G. Washington Coffee Company was making earnings and profits in excess of $10 per share on each share of common stock and was paying dividends of about $10 per share annually. The only source of trust income was from dividends on this stock. The transactions recited in the trust instrument were accomplished, i.e., petitioners George and Lina Washington conveyed the Homestead Tract realty to the trust; the three petitioners as undivided owners conveyed the personalty; and each petitioner transferred 3,000 shares of the company stock. No additional assets were ever added to the trust. During the first year of the existence of the trust the trustees had sufficient income from the dividends on the stock to enable them to meet all the requirements of the trust and pay annual income in excess of such requirements over to the three petitioners in equal parts. The trustees never paid obligations in anticipation of their due date. The trustees filed Federal income *436 tax returns for all the years, reporting the gross income and deducting mortgage interest and local taxes, the net income being shown as distributed equally among the three petitioners who reported their respective shares of income in their individual tax returns. Starting in 1937 the gross income of the trust began to diminish until it reached the point where the income was not sufficient to enable the trustees to meet the payments required of them by the trust. Petitioners reduced their living expenses, they moved out of the large house into the superintendent's cottage on the estate and rented the large house for $3,600 per year. They later sold the entire estate in February, 1942, for $70,000, at which time the original mortgage of $180,000 had been reduced to $106,000. After the sale they continued to live in the superintendent's cottage, paying rent for it to the new owner. By reason of the decrease of trust income petitioners, for three or four years, considered altering or revoking the trust. On November 12, 1940, the three of them gave notice to the trustees of their intent to revoke, alter or amend the instrument during 1941 and on September 16, 1941, by written instrument, *437 they revoked the trust. Thereupon the trustees returned the stock constituting the trust property to the grantors in the same proportion as it had been conveyed by them to the trust. Thereafter the stock went into a voting trust. The decision to revoke the trust was voluntary on the part of each petitioner and was not influenced in any way by the pendency of this gift tax proceeding. Immediately prior to the creation of the trust the Homestead Tract was owned by George Washington, Sr. and upon his acquisition of it in 1928 he had assumed the mortgage on it which called for payments on principal at the rate of $15,000 a year. Between the date of the creation of the trust in 1932 and its revocation in 1942 the mortgage indebtedness on the Homestead Tract was reduced by payments from $152,000 to $106,000. At the time of the creation of the trust the Homestead Tract, together with all goods, chattels, and personal property located thereon had a fair market value of $152,000 at the date of the creation of the trust and were then encumbered with a mortgage indebtedness thereon of $152,000. In a prior proceeding before the Board respondent determined an income tax deficiency against petitioner *438 George Washington, Sr., on the theory, in part, that the entire income of the trust should be taxed to him, the gifts being mala fide. As part of its findings of fact the Board found that the "trust instrument could be revoked, altered, or amended by the settlors during the lifetime of the petitioner, but thereafter was to be irrevocable." The trust instrument involved in this proceeding is the same instrument considered by the Board in the earlier proceeding. The deficiencies in the earlier proceeding were against George Washington, Sr., and were for income tax for the years 1930 to 1933, inclusive. In addition, fraud penalties were determined. The case is reported at . Petitioners did not believe there was a gift tax liability when the trust was created and did not file gift tax returns for 1932. They filed them immediately after the revenue agent in charge advised them that his office had the matter of the gift tax under consideration. It is stipulated and hereby found that the common stock of the G. Washington Coffee Refining Company had a fair market value of $100 per share at the date of the creation of the trust; that petitioner *439 George Washington, Sr., was born May 20, 1871; that petitioner Lina Washington was born September 14, 1877; that petitioner Louise Washington was born May 4, 1897; that the reversion or present value of $1.00 due at the end of the year of death of a person 61 years of age is $0.61163; that the reversion or present value of $1.00 due at the end of the year of death of a person 55 years of age is $0.53931; that the reversion or present value of $1.00 due at the end of the year of death of a person 35 years of age is $0.34060; that petitioner George Washington is the only one of the three petitioners who has used any of the $50,000 specific gift tax exemption, and as to other tax years, he has had the benefit of $2,000 of his exemption. Opinion There is now no longer any question but that the remainder interests established by these transfers were taxable gifts to as complete an extent as the life estates. ; . The principal issue is whether the creation of this trust by a daughter and her parents for the purpose of providing for the upkeep of the family *440 residence was a pro tanto gift by each, or whether its provision for revocation by the joint action of the three made it a revocable transfer not subject to tax. The point to be emphasized is that the consent required for revocation of the trust was limited to the co-grantors. Incontrovertibly upon revocation each would reacquire the property he had originally contributed. Except for the worthless real property, this was equal and of reciprocal value. It follows that the present proceeding is not like the cases where consent of a beneficiary is a prerequisite to revocation, and where it can be assumed that the beneficiary will profit from a continuation of the trust and will take no benefit from its revocation. Nor is it like the cases where expressly or by implication of law all of the interested parties can concur in revocation. ; . Here there were other beneficiaries who had nothing to say. If the three grantors determined that the trust was to be revoked, that would end the matter. The contention is made that nevertheless each grantor had an interest *441 adverse to that of his associates and hence that there was in each a substantial interest adverse to the revocation of the trust. We think this argument proves too much. If the father, by virtue of the provisions for payment of the mortgage, was, as respondent contends, "given the right to have his own obligations discharged by the trust in accordance with its terms," and if "a right of a taxpayer to have the income of a trust used to discharge his obligation gives him a substantial interest in such trust," it seems to us it would follow that to that extent his daughter and his wife would correspondingly benefit by a revocation of the trust, and therefore could be expected to favor such a revocation or at least not to oppose it. If, on the other hand, as respondent further contends, upon a revocation of the trust "Louise [the daughter] and Lina [the mother] would lose the legal right to live at Mendham as Mendham would then go back to George Washington * * * and each of them would likewise lose the absolute right to have the income from 9,000 shares of the stock devoted to its upkeep and maintenance," and if, as a result of that circumstance and the longer expectancies of life of *442 the daughter and to a lesser extent the mother, they would benefit by a maintenance of the trust, as respondent also contends, then to that extent the father could be expected to favor a revocation of the trust since its continued existence was responsible for that preponderant advantage in favor of the other grantors and correspondingly detrimental to him. From this it would be reasonable to argue that neither would the father stand out against the mother or daughter if they should favor the revocation of the trust, nor would the mother or daughter stand out against the father. On the showing made, an advantage would accrue to each grantor from a revocation which we are not prepared to say would outweigh the respective disadvantage. Certainly, it is not easy to determine that there was in any one of the three grantors a "substantial" adverse interest and this the statute requires. , affirmed (C.C.A., 1st Cir.), . The argument leads to this final absurdity - "That is to say, in case Lina or Louise sought to revoke the trust, George Washington might reasonably be expected to oppose *443 it." But on the other hand - "Would Louise and Lina, for example, be likely to stand out against George's wishes in case he desired to take back Mendham and his 3,000 shares"? The answer assumed by respondent is in the affirmative. Thus, each grantor could be expected to look with disfavor upon a revocation of the trust, and one might say that he or she might never propose it. In that case no revocation would take place. But that would not be because of the adverse interests of others but rather on the ground that each grantor himself was unwilling to revoke. This is a test extrinsic to that provided by section 501, which deals with the power to revoke, not the fact or likelihood of its exercise. We conclude that the trust was revocable within the terms of Revenue Act of 1932, section 501 and, therefore, that no taxable gift resulted. . This disposition makes it unnecessary to consider petitioner's alternative claim of res judicata. Decision will be entered for petitioners.